Patrick M. Flatley
United States Bankruptcy Judge

**Dated: Thursday, March 09, 2017 3:25:55 PM**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RECKART EQUIPMENT CO., INC., | ) | Case No. 12-bk-670 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| _____ | ) | |
| | ) | |
| DAVIS TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 13-ap-26 |
| | ) | |
| CITIZENS BANK OF WEST VIRGINIA, INC., | ) | |
| and NATALIE E. TENNANT, WEST VIRGINIA | ) | |
| SECRETARY OF STATE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION and PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

Currently before the court are motions for summary judgment filed by each party in this proceeding.  Citizens Bank of West Virginia, Inc. ("Citizens") and Davis Trust Company ("Davis Trust") each seek summary judgment on their respective negligence claims against Natalie E. Tennant, the then-serving West Virginia Secretary of State (the "WVSOS") relating to the indexing of a financing statement presented to the WVSOS by Citizens regarding a debt and security agreement between Citizens and Reckart Equipment Co., Inc. (the "Debtor").  Citizens also seeks summary judgment on its claim that it has a first-priority interest in the Debtor's collateral.  The WVSOS also filed a motion for summary judgment seeking summary judgment in her favor on the negligence claims of both Citizens and Davis Trust.

1

For the reasons stated herein, the court will partially grant Citizens's motion for summary judgment as Citizens's security interest is of superior priority to that of Davis Trust, deny Citizens's and Davis Trust's motions for summary judgment pertaining to the negligence claims, and partially grant and partially deny the WVSOS's motion for summary judgment.

## I.  JURISDICTION

Bankruptcy courts, like district courts are courts of limited jurisdiction.  District courts have original jurisdiction over all civil proceedings arising under title 11, or arising in or related to cases under title 11.  28 U.S.C. § 1334.  Furthermore, district courts may refer such matters to bankruptcy courts.  28 U.S.C. § 157.  Upon referral, bankruptcy courts have statutory authority to hear and enter final orders in core proceedings and in non-core proceedings if the interested parties consent; and to hear and enter proposed findings of fact and conclusions of law for non-core proceedings where unanimous consent is lacking.  28 U.S.C. § 157.

The parties here assert, and the court agrees, that the court has jurisdiction over the priority dispute between Davis Trust and Citizens because that is a core proceeding.  28 U.S.C. § 157(b)(2)(K).  Thus, the court has both jurisdiction and authority to hear the priority dispute and enter final judgment on the issue.  The court will, therefore, by final judgment determine the priority dispute through this memorandum opinion and concomitant order.

Regarding the negligence claims against the WVSOS, she asserts that the claims are non-core but otherwise related to the bankruptcy proceeding.  The WVSOS, however, does not consent to this court entering a final order on the non-core negligence proceeding.  The court acknowledges the position of the WVSOS.  Clearly, the negligence proceeding is related to the bankruptcy case of the Debtor.  A civil proceeding is related to bankruptcy if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)[1].  Moreover, "a key word in this test is 'conceivable.'  Certainty, or even likelihood, is not the requirement." *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 264 (3rd Cir. 1991).  In this case, at the time the complaint was amended to assert a claim against the WVSOS, the administration of the estate would have been affected had either Davis Trust or Citizens prevailed on its negligence claim before the closure of the Debtor's bankruptcy case because the WVSOS could be entitled

---

[1] The Fourth Circuit adopted the *Pacor* analysis in *In re A.H. Robins Co. Inc.*, 86 F.3d 364, 371 (4th Cir. 1996).

to subrogation under § 509 of the Bankruptcy Code.  Moreover, the court could potentially deny subrogation on equitable grounds, thus reducing the total claims against the estate and creating the potential for greater distribution to other unsecured creditors.  *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579 (5th Cir. 1999); *see also Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.*, 575 B.R. 526, 561 (S.D. Oh. 2012) (finding that it is conceivable that a third-party defendant would be unsuccessful in asserting rights such as subrogation and indemnification such that the total value of claims against the debtor would be reduced). Furthermore, it is inconsequential that the bankruptcy case is now closed and that distribution to creditors is fixed because subject matter jurisdiction is fixed at the time the case is filed.  *Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp),* 124 F.3d 619, 626 (4th Cir. 1997).

Thus, this court may entertain the negligence disputes between the WVSOS and Davis Trust and Citizens.  However, because the proceedings are non-core, the court lacks sufficient statutory authority to enter a final order without the consent of all the parties.  As the WVSOS does not consent to the court's entry of a final order, the court may submit proposed findings of fact and conclusions of law to be reviewed *de novo* by the district court regarding any final disposition suggest by this court.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is only appropriate if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment must make a prima facie case by showing: first, the apparent absence of any genuine dispute of material fact; and second, the movant's entitlement to judgment as a matter of law on the basis of undisputed facts. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 248 (1986).

The movant bears the burden of proof to establish that there is no genuine dispute of material fact.  *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  Showing an absence of any genuine dispute as to any material fact satisfies this burden.  *Id*. at 323.  Material facts are those necessary to establish the elements of the cause of action.  *Anderson*, 477 U.S. at 248.  Thus, the existence of a factual dispute is material—thereby precluding summary judgment—only if the disputed fact is determinative of the outcome under applicable law.  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).  "Disposition by summary judgment is appropriate . . . where the record as a

3

whole could not lead a rational trier of fact to find for the non-movant." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (citation omitted); *see also Anderson*, 477 U.S. at 248.

If the moving party satisfies this burden, the nonmoving party must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. *Celotex Corp.*, 477 U.S. at 322-23. The court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Shaw*, 13 F.3d at 798. However, the court's role is not "to weigh the evidence and determine the truth of the matter [but to] determine whether there is a need for a trial." *Anderson*, 477 U.S. at 249-50. Nor should the court make credibility determinations. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). If no genuine issue of material fact exists, the court has a duty to prevent claims and defenses not supported in fact from proceeding to trial. *Celotex Corp.*, 477 U.S. at 317.

### III. BACKGROUND

The underlying dispute in this proceeding pertains to whether a financing statement presented to the WVSOS by Citizens effectively perfected Citizens's security interest in the Debtor's personal property. Because Davis Trust entered into a subsequent security agreement with the Debtor after Citizens filed a financing statement to perfect its security interest but before the WVSOS properly indexed such financing statement, a dispute exists as to whether Citizens or Davis Trust possesses a first-priority security interest.

Citizens made two loans to the Debtor in November 2007. The first loan was for $2,365,000 and the second was a $1,000,000 credit line. At the same time, it made additional loans to a sister company of the Debtor, DSTS, Inc. In an attempt to perfect security interests in the Debtor's collateral relating to those loans, it sent a single envelope containing financing statements for both entities via the U.S. Postal Service to the WVSOS. On January 10, 2008, the WVSOS received Citizens's envelope which contained a UCC-1 Financing Statement listing DSTS as the debtor (the "DSTS Financing Statement"), a second UCC-1 Financing Statement listing the Debtor as the debtor (the "2008 Financing Statement"), and a check for $10 that included the memo "Recording Fees Reckart Equipment Company." The 2008 Financing Statement included an attachment that listed the collateral to which the financing statement applied, effectively providing a blanket lien on all of the Debtor's personal property. Upon receiving these documents, the WVSOS stamped both financing statements with the same record identification number, accepted the check, and indexed both financing statements under DSTS.

4

On or before September 2, 2009, Citizens discovered that the 2008 Financing Statement was absent from the list of liens associated with the Debtor in the UCC index. Citizens thus contacted the WVSOS and expressed its concern that its 2008 Financing Statement was improperly indexed. In response, the WVSOS designated a new indexing number for the 2008 Financing Statement and backdated it to reflect that it had been indexed on January 10, 2008.

On May 20, 2009, Davis Trust granted the Debtor a credit line up to $450,000. Notably, this occurred between January 10, 2008, when Citizens mailed its 2008 Financing Statement and September 2, 2009, when the WVSOS indexed the 2008 Financing Statement under the Debtor's name. Before providing the credit line to the Debtor, it conducted a UCC search relating to the Debtor on January 21, 2009. It conducted a second search on May 21, 2009. Neither search revealed Citizens's security interest in the Debtor's collateral. It then filed its own UCC-1 financing statement (the "Davis Trust Financing Statement") with the WVSOS on May 21, 2009. That financing statement perfected Davis Trust's interest in all equipment, inventories, or accounts receivable of the Debtor. Davis Trust then filed a second UCC-1 on July 10, 2009 which perfected its security interest in the Debtor's "inventory, accounts and equipment; whether any of the foregoing is owned now or acquired later" and the proceeds derived therefrom.

On March 1, 2011, Davis Trust discovered Citizens's 2008 Financing Statement had been backdated to January 10, 2008. In response, representatives of Davis Trust contacted employees of Citizens and learned of Citizens's lien on the Debtor's property.

Although the primary dispute originates from the treatment of the 2008 Financing Statement, two additional financing statements impact the court's review of the priority and negligence disputes among the parties. First, Citizens filed a UCC-1 financing statement in 1974 (the "1974 Financing Statement") which perfected its interest in certain collateral of the Debtor at that time. That financing statement perfected Citizen's security interest in "all new Franklin Skidders, Taylor Skidders, and fork lifts, Precision equipment, Corley Equipment, Hosmer Debarker equipment, as well as new and used of all makes of sawmill equipment and construction equipment." Moreover, it has remained effective by Citizens periodically filing continuation statements. Second, the principals of the Debtor, the Reckarts, filed a UCC-1 financing statement in 2007 (the "Assigned Financing Statement") pertaining to the Debtor's "furniture, fixtures, inventory, vehicles, or other personal property, accounts receivable" or proceeds generated therefrom, and any such property therein after-acquired. On March 25, 2011,

5

the Reckarts assigned their interest in that financing statement to Citizens. The Assigned Financing Statement, if otherwise effective, remains effective based upon continuation statements routinely filed by the secured party.

Thus, on May 7, 2012, when the Debtor filed its Chapter 11 petition for bankruptcy protection,[2] the competing financing statements were the 1974 Financing Statement filed by Citizens and pertaining to a more limited array of the Debtor's property; the Assigned Financing Statement filed by Darrell and Sharon Reckart on August 2, 2007, but assigned to Citizens on March 25, 2011; the 2008 Financing Statement filed by Citizens that was received by the WVSOS on January 10, 2008, incorrectly indexed until September 2, 2009, but backdated to January 10, 2008; and the Davis Trust Financing Statements filed on May 21, 2009 and July 10, 2009.

## IV. ANALYSIS

Citizens and Davis Trust currently dispute which entity has a first-priority security interest in the Debtor's personal property. Citizens maintains that it has priority because the 2008 Financing Statement, though initially misindexed, was filed and is thus valid as of January 10, 2008. Davis Trust asserts that it has priority because the 2008 Financing Statement was not properly filed by Citizens, and that the WVSOS accepted its financing statements before it indexed the 2008 Financing Statement. Both Davis Trust and Citizens assert that neither the 1974 Financing Statement nor Assigned Financing Statements impact the priority dispute. The WVSOS asserts that Citizens holds priority over Davis Trust with regard to the Debtor's collateral because the 1974 Financing Statement covers some of the property, the Assigned Financing Statement is valid and dated August 2, 2007, and the 2008 Financing Statement dates back to January 10, 2008. The WVSOS further argues that Citizens and Davis Trust have settled their priority dispute and engaged in a problematic and secretive settlement.[3] Citizens and Davis

---

[2]  The court later converted the Debtor's case to one under Chapter 7 on July 3, 2012.

[3]  The WVSOS is particularly concerned with the terms of a settlement entered into between Citizens and Davis Trust. She asserts that the parties settled the priority issue, but this does not appear to be the case. Rather, Davis Trust and Citizens appear to have agreed to terms by which they will allocate the proceeds, if any, stemming from this ongoing litigation with the WVSOS. Furthermore, Citizens and Davis Trust have disclosed their agreement to the court and to the WVSOS. Any concern over the timing of that disclosure is unnecessary. Because this adversary proceeding does not involve estate property, Federal Rule of Bankruptcy Procedure 9019 does

6

Trust assert that they have entered into an agreement absolving any dispute between one another but have not reached a determination as to which party has priority.

Additionally, both Citizens and Davis Trust assert causes of action in negligence against the WVSOS for any damages that they incurred as a result of the improper processing of Citizens's 2008 Financing Statement.  In response, the WVSOS argues that Citizens does not have a cause of action because it was not damaged by any mistake of the WVSOS because it has priority over Davis Trust with regard to the Debtor's collateral.  Moreover, the WVSOS argues that Davis Trust does not have a valid negligence claim because Citizens was perfected by the 1974 and Assigned Financing Statements such that Davis Trust suffered no harm based on any mistakes relating to the 2008 Financing Statement.  Finally, the WVSOS argues that any claims of negligence brought by Citizens or Davis Trust are barred by the statute of limitations, the 11th Amendment, and qualified immunity.  Before the court can consider summary judgment of the negligence claims, it must first consider who has priority in the Debtor's collateral.[4]

*a.  Priority*

West Virginia law adopting Article 9 of the UCC governs the order of priority among secured creditors, and when and how a security interest is perfected.  Under W. Va. Code § 46-9-322, the first person or entity to file a financing statement or perfect their security interest will assume first priority among competing security interests.  Moreover, a soon-to-be secured creditor may file a financing statement before a security agreement is made or a security interest otherwise attaches. W. Va. Code § 46-9-502(d).  This procedure allows a secured creditor to achieve priority over a competing creditor by pre-filing a financing statement even if a competing secured creditor perfects its lien first.  *Zucker v. Wesbanco Bank, Inc. (In re Fairmont General Hospital)*, 546 B.R. 659, 666 (Bankr. N.D.W. Va. 2016) (noting that "financing statements filed before the creation of a security interest, or before such a security interest attaches to the collateral do have some legal effect" because a creditor may obtain priority by

---

not govern.  Thus, the court does not take issue with the failure to disclose the settlement between Citizens and Davis Trust.

[4] At a telephonic hearing held on June 14, 2016, all parties agreed that the court should resolve the lien priority issue through the dispositive motions addressing the negligence claims.  The court then ordered that all dispositive motions, including those addressing the lien priority issue, should be filed by August 1, 2016.  Moreover, Citizens specifically requests that the court enter summary judgment in its favor on the issue of lien priority.

pre-filing a financing statement).  Although Article 9 permits a party to file a financing statement before obtaining a security agreement, it may only do so with the permission of the debtor.  W. Va. Code § 46-9-509(a)(1).

Nonetheless, a priority dispute only arises if there are competing perfected security interests.  A filed financing statement that is not related to an underlying security interest does not perfect an interest until it relates to an attached security interest.  W. Va. Code § 46-9-308(a).  For a security interest to attach to collateral, and thus become enforceable against the debtor, the secured party must give value in consideration for the security interest, the debtor must have rights in the collateral, and the debtor must authenticate a security agreement.  W. Va. Code § 46-9-203(b).  Thus, a financing statement referencing a secured party validly perfects an interest only if (1) it relates to a creditor that possesses an interest in property which secures payment or performance of an obligation, (2) the security interest is attached to the collateral, and (3) the financing statement is effective.  However, there is no requirement "that there be a separate written document labeled 'security agreement'" to effectively authenticate such an agreement. *In re Weir-Penn*, *Inc.*, 344 B.R. 791, 793 (Bankr. N.D.W. Va. 2006).  Rather, a collection of documents, including a signed financing agreement, may effectively establish that the parties authenticated a security agreement. *Id.*

 Furthermore, a financing statement only relates to collateral that it sufficiently identifies.  W. Va. Code § 46-9-504.  A creditor may indicate the collateral covered by a financing statement by specifically listing the property, naming the category, listing the type of collateral as defined by the U.C.C., or indicating that the financing statement covers all personal property of the debtor.  W. Va. Code §§ 46-9-108 and 46-9-504.  The U.C.C. defines several types of collateral including consumer goods, equipment, farm products, and inventory.  W. Va. Code § 46-9-102.

To perfect an interest in collateral, a financing statement must be effective. *Zucker*, 546 B.R. at 666.  A financing statement is considered to be effective as long as it is properly filed.  W. Va. Code § 46-9-516(d) ("A record that is communicated to the filing office with tender of the filing fee, but which the filing office refuses to accept for a reason other than [insufficient information on the financing statement,] is effective as a filed record . . . ."); W. Va. Code § 46-9-517 ("The failure of the filing office to index a record correctly does not affect the effectiveness of the filed record.").  For a financing statement to be properly filed, it must

8

contain sufficient information, be communicated to the filing office in a medium it accepts, and be accompanied by a sufficient filing fee.  W. Va. Code § 46-9-516(a) and (b).  A financing statement is sufficient if it provides the name of the debtor, provides the name of the secured party or a representative of the secured party, and indicates the collateral covered by the financing statement.  W. Va. Code § 49-6-502.  Moreover, a financing statement that should have been rejected by the filing office, but was instead accepted and is otherwise sufficient, is valid despite any potential deficiencies associated with how it was filed.  W. Va. Code § 46-9-520(c).

Finally, a financing statement remains effective until a termination statement is filed or upon the expiration of five years unless a continuation statement is filed.  W. Va. Code § 46-9-515.  Merely satisfying a debt does not void a financing statement; rather, a debtor may request that a secured creditor file a termination statement.  W. Va. Code § 46-9-513.  Upon such a request, a secured creditor must comply; however, independent of such a request, a creditor has no obligation to file a termination statement.  *Id.*

The parties seek a determination of priority between Citizens and Davis Trust as to the Debtor's collateral for purposes of determining the extent of liability, if any, of the WVSOS for negligence claims brought by Davis Trust and Citizens.   As explained above, the order of priority is influenced by a 1974 financing statement filed by Citizens, a 2007 financing statement filed by Darrell and Sharon Reckart but assigned to Citizens in 2011, the 2008 Financing Statement that is the primary focus of this dispute, and financing statements filed by Davis Trust on May 21 and July 10 of 2009.

The WVSOS asserts that the 1974 Financing Statement effectively perfects Citizens in the Debtor's collateral.  Davis Trust and Citizens both argue that the description of collateral contained in the 1974 Financing Statement is sufficiently narrow such that it does not apply to any of the Debtor's current collateral.

The WVSOS asserts that the Assigned Financing Statement effectively perfects Citizens in all of the Debtor's collateral dating back to August 2, 2007.  Citizens and Davis Trust argue, however, that the Reckarts filed that financing statement without authorization, that it never attached to a debt of the Reckarts, and that the Debtor's indebtedness to the Reckarts was a sham

debt.[5]  Davis Trust and Citizens further argue that public policy blocks the assignment of naked financing statements.

The WVSOS and Citizens argue that Citizens maintains first priority as to the Debtor's collateral.  Citizens asserts its security interest takes priority over Davis Trust's security interest because the 2008 Financing Statement took effect on the date that it was delivered to the WVSOS regardless of any error by the WVSOS.  The WVSOS asserts that Davis Trust and Citizens settled their dispute and determined that Citizens has priority.  Notably both Citizens and Davis Trust deny that claim.

There are no factual disputes regarding the validity of the 1974 Financing Statement. Citizens filed it in 1974, and maintained its effectiveness by filing continuation statements every five years since then.  The financing statement provides that Citizens is perfected in all new Franklin skidders, Taylor skidders and fork lifts, Precision equipment, Corley Equipment, Hosmer Debarker equipment, as well as new and used of all makes of sawmill equipment and construction equipment.  It further provides that the financing statement covers all proceeds of the collateral listed above.  While it is impossible for the court to currently determine what became of the collateral described in this financing statement, it is plausible that the Debtor's property at the time it filed its bankruptcy petition included proceeds of the collateral described therein.  To the extent that property of the Debtor was purchased with proceeds of Citizens's collateral under the 1974 Financing Statement, such property is covered by the 1974 Financing Statement.  Furthermore, many of the items listed on the Debtor's Schedule B are heavy machinery or logging equipment that may fall into the broad categories of sawmill or construction equipment.  Thus, to the extent that any of that property held by the Debtor at the time of filing its bankruptcy petition was either proceeds of the property described by the 1974 Financing Statement or is currently property of the type described in the 1974 Financing Statement, Citizens's perfection relates back to 1974 and it maintains priority over Davis Trust.

---

[5] The WVSOS alleges that the opposing parties, particularly Citizens should be estopped from arguing that the Assigned Financing Statement is invalid or otherwise does not affect priority because they have previously led the WVSOS to believe that it had priority over Davis Trust due to its perfection arising out of the Assigned Financing Statement.  However, an abundance of case law indicates that parties are free to adopt alternative theories during the course of litigation. Thus, no further consideration of this argument is necessary.

Davis Trust and Citizens seek to challenge every aspect of the validity of the Assigned Financing Statement.  First, they assert that the Reckarts never obtained a security agreement such that the financing statement never perfected an interest in the proprety of the Debtor.  Second, they assert that the Reckarts were not authorized to file a financing statement against the Debtor's collateral.  Third, they argue that the debt owed to the Reckarts by the Debtor was a sham designed only to shield the Debtor's assets.  Finally, they assert that because the Reckarts did not hold a perfected interest in the Debtor's collateral, they assigned a naked financing statement and that such an assignment should be without legal affect.

Many of these arguments are red herrings.  First, the existence of a security agreement between the Debtor and the Reckarts, and whether the debt to the Reckarts actually existed, is largely inconsequential.  A financing statement only perfects an interest in a debtor's collateral if it relates to a creditor that possesses an interest in property that secures payment or performance of an obligation and the security interest is attached to the collateral.  In the case of an assigned financing statement, the pertinent examination is whether the assignee possesses a security interest attached to the property of the debtor.  Whether the assignor possessed an attached and perfected security interest is inconsequential because Article 9 permits the assignment of financing statements and because it measures priority from the date a financing statement is filed, even if it is filed before a security agreement is entered.  *Interbusiness Bank v. First Nat. Bank of Mifflin*, 318 F.Supp.2d 230, 240 (M.D. Pa. 2004) ("Whatever the path followed, as soon as a party holds a security interest (arising through attachment of collateral) and is named as a secured party in a financing statement covering the collateral, the interest is perfected and priority is established as of the original date of filing.")  Thus, in a case such as this one, where a secured creditor receives an interest in a financing statement on assignment, if the secured creditor then possesses a security agreement with the debtor, its interest perfects upon the receipt of the assignment, but its perfection relates back to the date when the financing statement was first filed.  Whether the assignor then possessed or ever possessed an attached and perfected security interest is of no consequence.  Rather, the financing statement perfects the attached security interest of the assignee.  Because there is no dispute as to whether a security agreement existed between the Debtor and Citizens at the time of the assignment by the Reckarts, Citizens became perfected by the Assigned Financing Statement upon receiving the assignment.

11

However, Citizens and Davis Trust assert that such an assignment amounts to a bare assignment that should not be permitted by this court.  Despite their argument in that regard, the "assignment of a 'bare' financing statement, divorced from any underlying security interest, is nonetheless a valuable asset."  *Interbusiness Bank*, 318 F. Supp.2d at 240.  Davis Trust and Citizens argue that allowing for such an assignment permits parties to traffic in financing statements by selling off their priority positions to future lenders.  The court finds this argument unpersuasive, however, because Article 9 provides for assignments of security interests, and a debtor wishing to avoid such a problem may demand a creditor terminate its financing statement upon satisfaction of a debt under W. Va. Code § 46-9-513(c).[6]

Nonetheless, the filing of a financing statement must be authorized by the debtor to have any legal effect.  W. Va. Code § 46-9-509 (requiring authorization through an authenticated record or a security agreement).  In this case, there is a genuine dispute of material fact as to whether the Reckarts received authorization from the Debtor to file a financing statement.  Both Citizens and Davis Trust assert that the Reckarts lacked such authorization.  The WVSOS asserts that such authorization exists and is demonstrated by the signature of the Debtor on a purported financing statement, a loan agreement, and a corporate resolution granting the Debtor authority to enter into the loan transaction with the Reckarts.

An authenticated security agreement is *ipso facto* authorization for the creditor to file a financing statement.  W. Va. Code § 46-9-509 cmt. 4.  However, in this case, no such security agreement has been produced.  Moreover, a signature on a financing statement would serve as definitive evidence that such a filing was authorized.  But it is unclear, at this time, whether the Debtor signed a financing statement.  The 2011 Financing Statement that bears the WVSOS's

---

[6]  Moreover, a finding that the assignment of a bare financing statement to a new secured creditor is improper would produce incongruent results.  Without an assignment, a secured creditor whose debt is satisfied may enter into a new security agreement with the debtor and receive the benefit of the earlier filed financing statement.  However, the parties here argue that such a transaction is unfair if an assignee derives benefit from the prior financing statement.  The apparent policy behind restricting "trafficking financing statements" is to prevent unsecured creditors from obtaining secured status by assignment from a former secured creditor.  Steven O. Weise, U.C.C. Article 9: Personal Property Secured Transactions, 50 Bus. Law. 1553, 1564.  However, so long as the assignee possesses a security agreement, they are a secured creditor, and such an assignment only affects issues of priority.  If a party is concerned about potential priority issues stemming from the relation back to old financing statements, then it should demand that the debtor request that a creditor possessing an extant financing statement file a termination statement before extending subsequent credit to a debtor.

stamp does not have a signature of the Debtor. However, a second document, purporting to be an earlier financing statement and naming the Reckarts as the secured party does appear to be signed by the Debtor. Unfortunately, it is unclear when that financing statement was signed and whether it was ever filed with the WVSOS. For that reason, the court cannot interpret the document as proof of the Debtor's authorization of the Reckart's to file a financing statement.

Thus, there is a genuine dispute of material fact as to whether the Assigned Financing Statement is effective, not because of a policy against the assignment of naked financing statements or because the Reckarts lacked a valid debt, but rather because it is unclear whether the Debtor ever authorized the Reckarts to file a financing statement.

The final UCC-1 financing statement deserving consideration is the 2008 Financing Statement. Citizens submitted this financing statement by mail to the WVSOS. There is no dispute as to whether this was a proper medium of delivery. It is also undisputed that the 2008 Financing Statement provided the names of the debtor and the secured party and indicated the collateral covered by the financing statement. Thus, the 2008 Financing Statement was properly filed so long as it was also accompanied by a sufficient filing fee. In this case, Citizens submitted two UCC-1s, one relating to the Debtor and another relating to DSTS, Inc., and tendered one $10 check. As the filing fee for a UCC-1 is $10, it is clear that Citizens did not submit sufficient funds to cover both financing statements. However, Citizens designated the single check for the Debtor's filing fee by writing "Recording Fee Reckart Equipment Company" on the memo line of the check. Thus, Citizens satisfied all of the necessary filing requirements such that the 2008 Financing Statement is effective as of the filing date even if the WVSOS refused to accept the record. W. Va. Code § 46-9-516(d). Moreover, because Article 9 provides that the "failure of the filing office to index a record correctly does not affect the effectiveness of the filed record," the 2008 Financing Statement is effective if the WVSOS accepted and improperly indexed the record. W. Va. Code § 46-9-516.

Therefore, it is undisputed that Citizens was perfected in the Debtor's collateral no later than January 10, 2008. Moreover, because Davis Trust did not file its pertinent financing statements until May 21 and July 10, 2009, Citizens maintains priority over Davis Trust with regard to the Debtor's collateral. Therefore, the court will declare, by contemporaneous order, that Citizens's interest in the Debtor's collateral takes priority over Davis Trust's interest in the same.

13

b. *Negligence and Related Defenses*[7]

Both Citizens and Davis Trust seek to recover from the WVSOS damages arising from its alleged negligence in failing to properly index the 2008 Financing Statement. Citizens asserts it is entitled to summary judgment because the WVSOS has a duty to maintain an accurate recording system, it breached that duty by failing to properly index the 2008 Financing Statement or by failing to indicate to Citizens that it was rejecting the 2008 Financing Statement, and its failure proximately caused damage to Citizens regardless of whether it has priority over Davis Trust. Similarly, Davis Trust asserts that the WVSOS owed it a duty to properly index UCC filings and accurately report UCC filings in searches conducted by prospective lenders. It further asserts that the WVSOS breached that duty by failing to index the 2008 Financing Statement, which resulted in proximate harm as Davis Trust granted new loans under the assumption that it would hold a first-priority security interest in the Debtor's property. Alternatively, Davis Trust argues that the WVSOS negligently backdated the 2008 Financing Statement if it initially rejected it because there was no legal basis for such backdating. Again, Davis Trust asserts that this action proximately harmed it because it loaned money to the Debtor while relying on its UCC searches that did not reveal Citizens's 2008 Financing Statement. The WVSOS seeks summary judgment because it argues that Citizens was first priority and was thus not harmed by the actions or inactions pertaining to the 2008 Financing Statement, that Davis Trust also was not harmed because it would not have had priority either way, and that the claims against it are barred by the 11th Amendment, qualified immunity, and the statute of limitations.

i. *Immunity*

The WVSOS asserts she is protected by the Eleventh Amendment and by qualified immunity. Both Citizens and Davis Trust argue otherwise based upon the WVSOS's waiver of the Eleventh Amendment through her conduct in litigating these claims and because qualified immunity does not protect the government when its actors are performing nondiscretionary tasks. The WVSOS asserts that she has not waived Eleventh Amendment immunity and that it can be raised at any time, even on appeal. Moreover, she asserts that qualified immunity properly

---

[7] As explained in the jurisdictional section of this memorandum opinion, the court lacks authority to enter any final orders on the negligence claim. Thus, the following discussion is submitted to the district court as proposed findings of fact and conclusions of law.

applies to the facts of this case because agents of the WVSOS had discretion in performing the tasks related to accepting, denying, and amending financing statements.

In addition to merely determining if the elements of negligence are satisfied, the court must also consider issues of constitutional and statutory immunity when the state of West Virginia is a defendant. The constitution provides the state with immunity from suit in any court of law or equity. W. Va. Const. Art. VI, § 35. However, an exception exists under the Governmental Tort Claims and Insurance Reform Act. W. Va. Code § 29-12-5(a) permits the State Board of Risk and Insurance Management to "purchase or contract for insurance and requires that such insurance policy 'shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits." *Eggleston v. West Virginia Dept. of Highways*, 189 W. Va. 230, 232 (1993). Thus, "suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability coverage, fall outside the traditional constitutional bar to suits against the State." *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents*, 310 S.E.2d 675, 676, Syllabus Pt. 2 (W. Va. 1983).

Qualified immunity offers additional protection to state agents executing discretionary tasks or for those involved in legislative or judicial decision-making. Specifically, "a public executive official who is acting within the scope of his authority and is not covered by the provisions of [the Governmental Tort Claims and Insurance Reform Act] is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known." *State v. Chase Securities, Inc.* 188 W. Va. 356, 364-365 (1992). Furthermore, "the doctrine of qualified immunity is equally applicable to actions brought only against state agencies." *Hess v. West Virginia Div. of Corrections*, 705 S.E.2d 125, 129 (W. Va. 2010).

In *Hess*, the Supreme Court of Appeals of West Virginia provided a two-part test for determining when qualified immunity serves as a bar for claims brought against state agency defendants. First, courts should look to whether the "relevant insurance policy waives the defense of qualified immunity." *Id.* At 130. Only if it does not, is it necessary to move to the second step to determine whether the conduct was for a legislative or judicial purpose or was otherwise "the exercise of an administrative function involving the determination of fundamental government policy." *Id.* Qualified immunity will then be inapplicable if an insurance policy is in

15

place and does not waive immunity as a defense, or if the conduct was neither for judicial or legislative purpose and it violated "bright-line rules." *Maston v. Wagner*, 781 S.E.2d 936, 953 (W. Va. 2015).

Additionally, the Eleventh Amendment grants states an additional protection as "an unconsenting State is immune from suits brought in federal courts by her own citizens." *Edelman v. Jordan*, 415 U.S. 651, 662 (1974). This protection applies even if the named defendant is an agent of the state. *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464 (1945) ("When an action is in essence one for the recovery of money from the state, the state is the real, substantial party in interests and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."). Moreover, the Eleventh Amendment is jurisdictional in nature, and may thus be considered by courts at any time. *Suarez Corp. Indus. V. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997). However it differs from other jurisdictional issues in that states may waive Eleventh Amendment immunity. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238(1985). Such waiver may be demonstrated either through express statutory or constitutional provision or through conduct during the course of litigation. *Lapides v. Bd. of Regents of the University System of Georgia*, 535 U.S. 613, 618-20 (2002).

Courts "will find a wavier either if the State voluntarily invokes our jurisdiction or else if the State makes a 'clear declaration' that it intends to submit itself to our jurisdiction." *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675-76 (1999) (quoting *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944)). Submitting to federal court jurisdiction by willingly appearing in federal court through bringing or removing a suit to federal court clearly demarcates a waiver. *Lapides,* 535 U.S. at 620. Moreover, prolonged involvement in litigation in federal court clearly demonstrates an intention to waive protection as "there are limits to how long a state may wait before claiming immunity." *McCray v. Maryland Dept. of Trans.*, 741 F.3d 480, 483 (4th Cir. 2014). The Fourth Circuit has explained that, in the right circumstances, entering a general appearance to defend a claim in federal court without raising an immunity defense waives such a defense. *Barfield v. Blackwood (In re Secretary of the Dept. of Crime Control and Public Safety)*, 7 F.3d 1140, 1148 n.6 (4th Cir. 1993). Furthermore, the Eleventh Amendment should not offer state actors an unfair tactical advantage. *Lapides*, 535 U.S. at 621 ("[A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to

16

avoid inconsistency, anomaly, and unfairness, and not upon a state's actual preference or desire,
which might, after all, favor selective use of 'immunity' to achieve litigation advantages.")

In this case, not the Eleventh Amendment, constitutional immunity, or qualified
immunity offer any protection to the WVSOS at this point.  First, the record fails to indicate
whether the state's insurance policy contains a waiver of qualified immunity.  Such a
determination would be necessary to determine that the WVSOS is immune.  Second, it is clear
that the conduct of the WVSOS was neither legislative nor judicial in nature.  Therefore, she is
only protected by qualified immunity if her conduct was not in violation of a clearly established
law of which a reasonable official would have known.  However, Article 9 provides a series of
bright-line rules that apply to the WVSOS in maintaining a filing system.  Specifically, with
respect to a record filed with the WVSOS, W. Va. Code § 46-9-519(a) provides that the WVSOS
*shall*:

    (1) Assign a unique number to the filed record;
    (2) Create a record that bears the number assigned to the filed record and the date and
        time of the filing;
    (3) Maintain the filed record for public inspection; and
    (4) Index the field record in accordance with [other provisions of Article 9].

Moreover, § 46-9-519(c) requires the WVSOS to "index an initial financing statement according
to the name of the debtor.  Additionally, § 46-9-520 sets forth two additional requirements for
the WVSOS.  It must "refuse to accept a record for filing for a reason set forth in § 9-516(b)"
and it must accept a record for filing if the record complies with § 9-516(b).  As explained above,
§ 46-9-516(b) provides that a record is properly filed if it contains sufficient information, is
communicated to the filing office in a medium it accepts, and is accompanied by a sufficient
filing fee.  Thus, Article 9 grants no discretion to the WVSOS for determining when a financing
statement should be rejected or accepted.

As is explained *supra* Part III.a., Citizens properly filed its 2008 Financing Statement.
The WVSOS received the 2008 Financing Statement in an acceptable method and medium, it
included the proper filing fee as a $10 check contained a memo that indicated it was intended for
the Debtor's filing fee, and it contained sufficient information.  Thus, § 46-9-520 required the
WVSOS to accept the 2008 Financing Statement.  Moreover, § 46-9-519(c) required the
WVSOS to assign it a unique number indexed under the name of the borrower.  As the WVSOS
is the agent responsible for maintaining the Article 9 financing system, she is tasked with

17

knowing these provisions.  Thus, a reasonable official would be familiar with them.  Thus, qualified immunity cannot apply on these facts.

In this case, the WVSOS did not voluntarily appear in federal court as it neither filed the suit nor removed it to federal courts.  Additionally, the WVSOS is not a creditor of the Debtor and has not filed a claim in the bankruptcy case of the Debtor.  Nonetheless, the WVSOS has participated in lengthy litigation in this proceeding.  She first filed an answer on February 24, 2014.  Since that time, she has participated in lengthy discovery, filed numerous motions, and even participated in a dispute regarding this court's constitutional authority to hear certain portions of this proceeding.  The WVSOS had ample opportunities to seek dismissal under the protections provided by Eleventh Amendment immunity, but she instead elected to proceed in the federal forum.  To permit the WVSOS to withdraw from the proceeding at this late hour would result in an unfair burden of additional legal costs for all parties involved.  Thus, under the framework set forth in *Lapides*, it is clear that the WVSOS has made a clear declaration of its intent to take advantage of the federal forum.

The court therefore **RECOMMENDS** that the district court deny summary judgment to the WVSOS based upon her Eleventh Amendment and immunity defenses.

*ii.   Statute of Limitations*

The WVSOS asserts that both Citizens's and Davis Trust's claims against her are barred by the two-year statute of limitations that applies to claims based in negligence.  Neither Citizens nor Davis Trust contest that a two-year statute of limitations applies to their claims, but both assert that the discovery rule applies and that they both brought their claims within two years of discovering the harm caused by the WVSOS's actions or inactions.

To determine whether a cause of action is time-barred in West Virginia, courts follow a five-step analysis:

> First, the court should identify the applicable statute of limitation for each cause of action.  Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred.  Third, the discovery rule should be applied to determine when the statute of limitations began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action . . . . Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action . . . .

18

> And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine.

*Dunn v. Rockwell*, 689 S.E.2d 255, 265 (W. Va. 2009).  First, the applicable statute of limitations for the tort of negligence is two years as the parties have correctly alleged.  W. Va. Code § 55-2-19.  The second step is to determine when the requisite elements occurred.  For a negligence claim, the applicable times are when an alleged duty was breached and when harm arose.  The remaining factors turn on whether the discovery rule applies.  As the *Dunn* court held, courts must always consider whether the discovery rule tolls the statute of limitations.  The discovery rule "tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation, and injury."  *Gaither v. City Hosp., Inc.*, 487 S.E.2d 901, 909 (W. Va. 1997).  Moreover, "the discovery rule is generally applicable to all torts, unless there is a clear statutory prohibition to its application."  *Dunn*, 689 S.E.2d at 262.  No such statutory prohibition exists for actions in negligence.  Thus, the discovery rule applies and

> the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

*Id*.

Finally, statutes of limitation can be subject to estoppel.  Estoppel applies if the party wishing to pursue an action "was induced to refrain from bringing his action within the statutory period by some affirmative act or conduct of the defendant or his agent and he relied upon such act or conduct to his detriment."  *Humble Oil & Refining Co. v. Lane*, 165 S.E.2d 578, 578 Syllabus Pt. 1 (W. Va. 1969).  However, such a policy only applies in limited circumstances where a promise or agreement is made; "a mere request by a debtor for delay" will not suffice.  *Id*. at 585.  Moreover, "the doctrine of estoppel should be applied cautiously, only when equity clearly requires that it be done, and this principle is applied with especial force when one undertakes to assert the doctrine of estoppel against the state."  *Samsell v. State Line Development Co.,* 174 S.E.2d 318, 320, Syllabus Point 7 (1970).

In this instance, the WVSOS asserts that, even after applying the discovery rule, the statute of limitations bars both Davis Trust and Citizens claims.

Specifically, the WVSOS asserts that Davis Trust discovered its injury no later than April 3, 2011, when its employees met with employees of Citizens. Davis Trust admits that it became aware, on March 1, 2011, that Citizens and Davis Trust faced a priority dispute relating to Citizens's 2008 Financing Statement. Moreover, it does not deny that its employees met with Citizens's employees on April 3, 2011. However, Davis Trust asserts that it was unaware of what led to the confusion surrounding the 2008 Financing Statement until April 3, 2013 when it spoke with counsel for the WVSOS. Thus, Davis Trust argues that, until then, it lacked any knowledge that the WVSOS improperly indexed the financing statement and then later backdated it and, therefore, asserts that it did not and could not know that the WVSOS's negligence proximately caused an injury because it was not yet aware that the WVSOS was involved in the priority dispute.

The WVSOS also asserts that Citizens discovered its injury on September 2, 2009, when it first discovered that its 2008 Financing Statement was not indexed. Citizens argues that its claim is not barred because it did not discover an injury because it did not suffer any harm until Davis Trust filed its suit against Citizens. Thus, it asserts that the statute of limitations should be measured from April 15, 2013, the date that Davis Trust filed its complaint naming Citizens as a defendant. Citizens further argues that the WVSOS is estopped from raising the statute of limitations because it assured Citizens that it remedied the issue.

Interpreting ambiguities in favor of Davis Trust, the WVSOS has not demonstrated that Davis Trust's claim is barred by the statute of limitations. Although it is clear that Davis Trust became aware of a priority dispute between itself and Citizens on March 1, 2011, there is insufficient evidence to demonstrate that it knew or should have known that the WVSOS acted in such a way that it caused the dispute. Rather, Davis Trust asserts that it inquired about the 2008 Financing Statement, but did not learn of the indexing error or communication between Citizens and the WVSOS until April 3, 2013. Because the discovery rule tolls the limitations period until the plaintiff discovers an injury, the identity of the party that caused the injury, and the conduct that caused the injury; and because it is unclear whether Davis Trust knew that the WVSOS caused the injury or how it was caused, the district court should not grant summary judgement to the WVSOS regarding whether the statute of limitations bars Davis Trust's claim based on the record thus far developed by the parties.

20

Turning to Citizens, when it discovered that the 2008 Financing Statement was improperly indexed on September 2, 2009, it became aware of an injury to-wit: that its perfection dating back to January 2008 was compromised. It also discovered that Davis Trust filed a financing statement perfecting its interest in the same collateral since January 2008, thus creating a clear priority dispute. Moreover, as of September 2, 2009, Citizens was aware that the WVSOS was at fault because the WVSOS admittedly failed to file its 2008 Financing Statement. As of September 2, 2009, Citizens was merely unaware of the extent of the injury it suffered.

Citizens asserts that the WVSOS is estopped from raising a statute of limitations defense as to Citizens's claim. Citizens claims that the WVSOS assured Citizens that the previously erroneously indexed filing was corrected when Citizens contacted the WVSOS on September 2, 2009. It further asserts that Citizens thus relied on the WVSOS's representation that the error was atoned for, and thus refrained from further action.

The WVSOS argues that there is no evidence of record supporting Citizens's assertion that it was induced to refrain from acting to its detriment because of its reasonable reliance on another party's misrepresentation of a material fact. However, the WVSOS did assure Citizens that it corrected the prior mistake by indexing and backdating the 2008 Financing Statement when Citizens approached the WVSOS about its error. Nonetheless, Citizens was aware that Davis Trust filed a financing statement between the time when Citizens first attempted to file its financing statement and when the WVSOS indexed the 2008 Financing Statement. Thus, it knew or should have known that it was exposed to a priority dispute regardless of the WVSOS's assertion that it corrected any prior error. Moreover, estoppel only applies when equity clearly requires that it be done, particularly when the doctrine of estoppel is asserted against a state actor. Equity does not justify applying the doctrine of estoppel to the statute of limitations defense in this case when Citizens maintains priority over Davis Trust, first discovered the potential for harm on September 2, 2009, and did not bring this negligence claim against the WVSOS until February 20, 2014. Citizens's claim expired on September 2, 2011.

The court therefore **RECOMMENDS** that the district court grant summary judgment to the WVSOS based upon her assertion that Citizens's claims are barred by the statute of limitations and deny summary judgment to her against Davis Trust.

21

*iii.  Negligence*

Citizens and Davis Trust both seek summary judgment asserting that they have set forth a *prima facie* case of negligence.  The WVSOS refutes these allegations by raising the defenses discussed above and asserting that neither Citizens nor Davis Trust adequately proved proximate causation.  Moreover, the WVSOS seeks summary judgment in her favor because she did not proximately cause any injury to either Citizens or Davis Trust.  The WVSOS argues that the 2008 Financing Statement, and the controversy surrounding it, lacked any impact on the priority dispute between Citizens and Davis Trust as Citizens already maintained priority through the Assigned Financing Statement and the 1974 Financing Statement.  Moreover, all three parties argue that a determination of whether the "tort of another" doctrine applies in West Virginia is necessary to resolve the proximate cause dispute.  Based upon the court's preceding recommendation—that the district court grant summary judgment to the WVSOS regarding Citizens's claims being barred by the statute of limitations—the following discussion pertains only to Davis Trust's negligence claim against the WVSOS.

Under West Virginia law, a claim for negligence requires a plaintiff to satisfy three elements "(1) A duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty."  *Webb v. Brown & Williamson Tobacco Co.*, 121 W. Va. 115, 115 S.E.2d 898, 899 (1939).  Moreover, a violation of a statute creates "a rebuttable prima facie presumption of negligence."  *Flanagan v. Mott*, 114 S.E.2d 331, 336 145 W. Va. 220, 226 (W. Va. 1960).  However, the statutory violation must be the proximate cause of the plaintiff's injury in order to be actionable.  *Pickett v. Taylor*, 178 W. Va. 805, 818 (1987).

The WVSOS's effort to rebut the presumption of a duty owed to Davis Trust falls short as she asserts that W. Va. Code § 46-9-517 places any risk of error in the filing office on the searcher.  However, § 46-9-517 merely assigns risk between a searcher and a filer, it does not serve as a waiver of responsibility for the filing office.  W. Va. Code § 46-9-517 Cmt. 2 ("[T]his section imposes the risk of filing-office error on those who search the files *rather than on those who file.*") (emphasis added).

Based on the violation of §46-9-519, discussed *supra* Part III.b.i., and additional failures by the WVSOS to properly index the 2008 Financing Statement, a prima facie presumption of negligence exists, and the WVSOS failed to rebut the existence of a duty to Citizens and Davis

Trust and the breach of that duty. Thus, the only remaining question is whether causation exists. The WVSOS asserts that Davis Trust fails to establish proximate cause at it was never entitled to first lien priority because of the existence of the Assigned Financing Statement and the 1974 Financing Statement. Thus, according to the WVSOS, Davis Trust could not have been entitled to priority even if the 2008 Financing Statement was entirely ineffective.

As is evident from the court's discussion of the various financing statements at issue here, a determination as to whether the failure to index the 2008 Financing Statement actually resulted in any harm suffered by Davis Trust cannot be made at this time. If the Assigned Financing Statement and the 1974 Financing Statement fully covered all of the Debtor's property, Davis Trust could not have obtained priority even if the 2008 Financing Statement was never filed. Davis Trust was put on notice of the existence of those other financing statements and elected to lend to the Debtor nonetheless. Should Davis Trust find itself unsecured because of that decision, the negligence of the WVSOS cannot be seen as a proximate cause of that result. If, however, Citizens only obtained priority in some or all of the Debtor's property through the 2008 Financing Statement, the negligence of the WVSOS in failing to properly index the financing statement could be the proximate cause that induced Davis Trust to lend to the Debtor but never obtain the secured status that it expected.

The court therefore **RECOMMENDS** that the district court deny summary judgment to Davis Trust on its negligence claim.

## V.  CONCLUSION

Based on the foregoing, the court hereby finds that Citizens has priority over Davis Trust. However, the complete basis for that priority remains somewhat unresolved as there is a genuine dispute as to whether the Reckarts received authorization to file the Assigned Financing Statement with the WVSOS. Moreover, the court recommends that the district court deny the WVSOS's  motion for summary judgment relating to Davis Trust's claim because she failed to demonstrate that qualified immunity, the Eleventh Amendment, or the statute of limitations bar the claims of Citizens and Davis Trust and because she failed to demonstrate a complete lack of causation. Similarly, Davis Trust's motions for summary judgment should be denied as it failed to prove, at this time, that causation exists. The court finally recommends that the district court grant the WVSOS's motion for summary judgment relating to Citizens's negligence claim as that

claim is barred by the applicable statute of limitations.  Similarly, the court recommends that the district court denies Citizens's motion for summary judgment because its claim is time-barred.